IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MCDONALD NORTH, §
§
     Plaintiff, §
VS. § CIVIL ACTION NO. 4:17-CV-02610
§
GENERAL PLASTICS AND COMPOSITES, §
L.P., §
§
     Defendant. §

## MEMORANDUM & ORDER

Pending before this Court is Defendant General Plastics and Composites, L.P.'s ("General Plastics") Motion for Summary Judgment, filed on May 20, 2019. (Doc. No. 35). Plaintiff North ("North" or "Plaintiff") moved for several extensions to respond to General Plastic's motion, which the Court granted. Pursuant to the last extension, North was given until July 5, 2019 to file his response but failed to do so. Therefore, General Plastic's motion for summary judgment is now ripe. For the reasons described below, the Court is of the opinion that the motion should be granted.

Also pending before the Court is General Plastics' Motion for Immediate Relief from Pretrial Filing Deadlines Pending Resolution of Summary Judgment Motion. (Doc. No. 50). That motion will be denied as moot.

### I.    Procedural Background

North originally filed two lawsuits against General Plastics, the first of which was filed on August 24, 2017 alleging that General Plastics did not pay him overtime under the FLSA, and the second of which was filed on December 1, 2017 asserting claims of discrimination and retaliation under Title VII of the Civil Rights Act of 1964. This Court ordered that the two lawsuits be consolidated on January 23, 2019. (Doc. No. 31). The Parties conducted discovery under an extended scheduling order.

General Plastic's Motion for Summary Judgment was filed on May 20, 2019. (Doc. No. 35). This Court's Local Rules state:

> Opposed motions will be submitted to the judge 21 days from filing without notice from the clerk and without appearance by counsel . . . . Failure to respond to a motion will be taken as a representation of no opposition.

S. Dist. Tex. L.R. 7.3, 7.4 (emphasis added); *see also* Hanen L.R. 7(D). Accordingly, North's response in opposition was due no later than June 10, 2019.

Since that date, several motions to extend this deadline have been filed and granted. On June 10, 2019, North filed his Unopposed Motion for Extension of Time to respond to the motion (Doc. No. 39), which the Court granted on June 12, 2019 (Doc. No. 40), thereby extending the filing deadline to June 12, 2019—the first new deadline requested by Plaintiff's counsel.

Later that day, on June 12, 2019, North filed a Second Motion for Extension of Time (Doc. No. 41), requesting that the Court further extend the deadline for filing his response in opposition to June 20, 2019. The Court granted this motion on June 18, 2019, in which it extended the deadline to June 24, 2019. (Doc. No. 42).

After that second extended deadline passed, Plaintiff's counsel filed a Motion for Leave to File Amending Pleading on June 29, 2019. (Doc. No. 47). Plaintiff's counsel did not attach any summary judgment response in conjunction with this motion. Opposing counsel agreed for Plaintiff's counsel to file the response on June 29, 2019. Nevertheless, the Court granted a longer extension than requested, with a new (third extended) deadline set for July 5, 2019. (Doc. No. 49). That deadline has passed with no response or additional requests for extensions filed by Plaintiff or his counsel.

## II.     The Facts Established by the Summary Judgment Evidence

General Plastics makes engineered components and turnkey products for oilfield services companies, such as composites, elastomers, and metal. (Doc. No. 35, Ex. A ("Williams Decl.")) ¶

4). The company hired North on March 1, 2013 as the Quality Control Inspector. (*Id.* ¶ 4). His title was changed in May 2015 to Quality Auditor. (*Id.* ¶ 5). In these positions, North's job responsibilities included "inspecting parts and processes to ensure quality and conformance with applicable standards." (*Id.* ¶ 5). In August 2015, North was promoted to Filament Wind Supervisor, a position in which he supervised the production process involved in winding filaments to make composite materials. (*Id.* ¶ 6).

In each position that North held with General Plastics, he was paid on an hourly basis as a non-exempt employee. (*Id.* ¶ 8). General Plastics' former HR director avers that the company never paid a salary to any employee who had held any of the three positions held by North. (*Id.* ¶ 8). In addition to this hourly rate, North was paid time and one-half for all overtime hours worked over forty hours per week. (*Id.* ¶ 9). In each position North held, he answered to a Production Supervisor, who was tasked with overseeing the seven departments in General Plastics (of which North supervised one department). (*Id.* ¶ 7). The only person at General Plastics with authority to fire employees is the company's CEO, David Walstad ("Walstad"). (*Id.* ¶ 2).

General Plastics had in place company policies and procedures during the entirety of North's employment. (*See id.* ¶¶ 10–11). Many of those policies and procedures were contained in the Employee Information Handbook. (*Id.* ¶ 11; Doc. No. 35, Ex. A-7 ("Employee Info. Handbook")). All employees are expected to comply with these policies and procedures. The handbook states the terms of General Plastic's at-will employment agreement: "[T]he right of the employee or of the Company to terminate the employment relationship '*at will*' is recognized and affirmed as a term of employment. '*At will*' means that any employee's employment can be terminated at any time with or without notice." (Employee Info. Handbook at 12). The Handbook further notes that while there are generally two steps to the disciplinary process, "[c]ause for

immediate termination may include . . . violation of the drug-free workplace policy, the conflicts of interest policy or the harassment policy." (*Id.* at 31).

Also amongst those policies were rules regarding compliance with the company's electronic time-keeping system, equal employment opportunity policies, and anti-harassment policies. (*See* Williams Decl. ¶¶ 10–11). North signed agreements that he understood and would follow company policies. (Doc. No. 35, Ex. A-8; Ex. A-9). General Plastics' anti-harassment policies delineate sexually harassing actions and explain that such conduct is prohibited. General Plastics' sexual harassment policy reads, in relevant part:

> Prohibited conduct includes . . . Unwelcome acts of a sexual nature, committed by either supervisor or non-supervisory personnel, that interferes with an employee's performance and/or creates an intimidating, hostile or offensive work environment. Such acts include, but are not limited to:
> – Unwelcome sexual flirtations, advances and/or propositions;
> – Verbal or written comments, jokes, teasing and/or other communications of a sexual nature;
> – Graphic comments about an individual's body;
> – The use of sexually degrading words to describe an individual;
> – The display of sexually suggestive objects and/or pictures;
> – Foul or obscene language and/or gestures;
> – Unwelcome physical conduct . . . .

(Employee Info. Handbook at 37; Williams Decl. ¶ 11). The policies encourage employees to report perceived discrimination or harassment to an immediate supervisor, and if the issue remains unresolved, then to a company officer. (Employee Info. Handbook at 38; Williams Decl. ¶ 11).

General Plastics' time-keeping policies and procedures required all hourly employees to work at the physical premises and always complete their work while clocked-in. (Williams Decl. ¶ 12). General Plastics provides overtime pay of time and one-half for all hourly employees who work more than forty hours per week. (*Id.* ¶ 12). General Plastics, according to Williams' sworn declaration, has never instructed supervisors, managers, or employees to work off-the-clock or permitted managers or supervisors to trim or otherwise adjust employee work time in a manner

inconsistent with the time actually worked. (*Id.* ¶ 12). The handbook explains that employees are to use swipe cards for recording time, and that this method was implemented to fulfill the requirements of federal law. (Employee Info. Handbook at 38). The handbook states:

> Swipe Cards are the sole means of recording the time each employee has spent working. Employees are required to swipe their card to fulfill the requirements of federal law, which calls for an accurate record of work hours . . . .
>
> Any changes to the clocked-time must be made in ink and initiated by the employee and supervisor.
>
> Each employee must "clock in" with his or her own Swipe Card at the beginning of the workday, as well as before and after the required 30 minute lunch break, and at the end of the workday.
>
> "Clocking in" or "Clocking out" for another employee is cause for termination, as is defacing or altering recorded time.

(Id. at 38). North was required to follow these company policies and procedures, which are discussed in more detail below. (Williams Decl. ¶ 10).

On May 13, 2016, a production worker named Sonia Olivares ("Olivares") filed a sexual harassment complaint against North. (Williams Decl. ¶ 13). Two General Plastics officers, HR Manager Charlie Chapman ("Chapman") and Vice President of Manufacturing Ron Seifert ("Seifert"), investigated Olivares' complaint. (*Id.* ¶ 13). The investigation included interviews and signed witness statements, including those of Olivares and North. (*Id.* ¶ 13). These documents and Chapman's handwritten notes suggest the following: Olivares alleged that when she began working at the company in August 2014, North would persistently ask her to go out with him and ask for her phone number. (Doc. No. 35, Ex. A-10 ("Investigation Notes")). North told her that she was "chicken" to go out with him because of the size of his genitals. *Id.* After a female coworker urged her to give North her phone number, Olivares did. North texted requesting photos. She sent a picture of her face, to which he responded asking for a picture of her backside (but used a derogatory slang term in Spanish). *Id.* North allegedly apologized, saying he used the wrong

word and that his Spanish was not very good. Her female coworker urged her not to say anything to the company, as North was going to become a supervisor. Nothing more happened for a year, except for North allegedly periodically asking her out. *Id.* Olivares alleged that about a week prior to the investigation, while she was walking at work with a coworker, North placed his hand on her backside. She also alleged that later that week, North again grabbed her backside. *Id.* She said she was alone when it happened and was bothered by the incident. *Id.* She made the report to Edgar Castro on May 17, 2016, which was the day she was first interviewed by Chapman. *Id.*

In North's interview, he denied the allegations that he had touched Olivares, referred to his body parts to her via text, or intentionally used a derogatory slang word to her. North contended that he had won money at a casino, and she had seen that as a reason to get close to him to try to get money from him. *Id.*

Some of the interviews conducted with witnesses, as reported in Chapman's notes, support some of Olivares' claims, such as the embarrassing content of the text sent to Olivares, and that Olivares had told other employees about the unwanted touching. *Id.* On the other hand, the eyewitness who was supposedly there during the first physical encounter said that he was not present when it allegedly happened and did not see it occur. *Id.* The investigation, according to North's disciplinary notice, found that he engaged in inappropriate conduct with an employee, although it could not substantiate whether the alleged touching occurred. (Doc. No. 35, Ex. A-11). Seifert and Chapman recommended that the company terminate North based on their investigation. (Doc. No. 35-7, Ex. E ("Seifert Dep.") at 118:23–119:10).

Based on the investigation and its findings, Walstad decided to suspend North and required him to attend sexual harassment training. (*Id.*; Williams Decl. ¶ 14; Doc. No. 35, Ex. A-13). North was issued written counseling. (*Id.* ¶ 14; Doc. No. 35, Ex. A-11). He was also moved to the night shift, purportedly to minimize his interactions with Olivares and other female employees.

(Williams Decl. ¶ 14). Seifert testified that he specifically told North that the move to the night shift was intended to separate him from Olivares, and that "this would be a chance for him to redeem himself." (Seifert Dep. at 120:3–6).

North began working the night shift on May 27, 2016, where he remained in the same position with the same title and responsibilities. (*Id.* ¶ 15). As a Filament Wind Supervisor, North supervised between four to seven employees. (*Id.* ¶ 15). A few weeks later, an employee made another complaint against North, this time alleging that North was letting employees leave the job site without signing out so they would receive pay for time not worked. (Seifert Dep. at 127:13–128:25). The complainant alleged that North was doing this for his friends in exchange for small kickbacks of several dollars for the pay received. (*Id.* at 128:16–22). Based on this allegation, General Plastics opened another investigation. As part of the investigation, Seifert and Chapman conducted an internal audit by watching hours of video logs of when employees came and left their shifts and comparing the video to the biometric scanners and time logs. [*Id.* at 133:17–135:3; Doc. No. 35-13, Ex. G].

General Plastics, according to uncontroverted summary judgment evidence, uses an electronic timekeeping and payroll system. (Doc. No. 35-8, Ex. F ("Cantu Decl.") ¶ 3). According to the Accounting Manager for General Plastics, "[t]here are two ways to record time entries . . . (1) use a biometric fingerprint scanner (which can only be accessed onsite at the time of the scan) to 'punch in' and 'punch out'; or (2) login to the password protected software." (*Id.*). Only supervisors, managers, or other time-approvers have the ability to use the second option, and its is reserved for correcting time entries for employees who forgot to clock in or out. (*Id.*).

The investigation determined that North had encouraged employees to leave or take breaks while he altered their time records to keep them "clocked in." (Williams Decl. ¶ 16). Seifert, one of the investigators, described his findings as follows: "What Charlie and I felt like we had a -- we

already had a smoking gun . . . when we observe this and watched I can't tell you how many examples of people physically leaving the building and then having this altered, this wasn't a simple 'I'm going to change five or ten minutes here or a missed punch.' These are significant hours of people leaving the facility . . . ." (Seifert Dep. at 141:21–23, 142:1–6). When Seifert presented North with the evidence that he had changed people's time logs and stolen from the company, Seifert avers that North's response was, "Okay. So now what?" (*Id.* at 144:8–12). Seifert suspended him and sent him home immediately. (*Id.* at 144:14–15). After showing their findings to Walstad, Walstad made the decision to terminate North. (*Id.*at 144:18–21).

North was fired on July 20, 2016. (Williams Decl. ¶ 6). General Plastics did not hire a replacement for North but instead decided to merge his job responsibilities into other existing positions. (*Id.* ¶ 17).

After his termination, North made two complaints for the first time: First, that his pay had been retroactively changed to reduce his pay. Second, that he had heard racial slurs used in reference to him at work by two co-workers. According to General Plastics, this second allegation was made known to the company for the first time in his EEOC charge.

Upon receiving North's complaint about his time adjustments, which was made shortly after his termination, General Plastics began a third investigation. That investigation determined, through an internal audit of North's time records and any adjustments made to them, that his supervisor Edgar Castro ("Castro") made sporadic and small incremental changes to his time records. The investigation found that "[m]any of the corrections were . . . necessary because North had failed to punch-in or punch-out for lunch, or to punch-out at the end of shifts." (Cantu Decl. ¶ 7). However, the investigation found a number of instances in which the investigators could not determine with certainty that the time corrections were necessary to fix an erroneous time entry. (*Id.* ¶¶ 8–9). The audit found that out of nine months investigated, only five weeks had such an

error. (*Id.* ¶ 9). The total time that could not be accounted for with certainty amounted to 19.75 hours of overtime, or $745.72. (*Id.*; Doc. No. 35-8, Ex. F-6). General Plastics retroactively paid North the $745.72. (Doc. No. 35-9, Ex. F-2 ("North Pay Statement July 29, 2016"); *see also* Cantu Decl. ¶ 11). In his deposition, North stated that he did not object to the amount paid or raise other complaints about the regular or overtime wages owed to him at that time or at other times during his employment. (Doc. No. 35-4, Ex. B ("North Dep.") at 359:4–19).

Through the investigation, General Plastics also learned that the time records of a few other employees had similar corrections made by Castro. (Seifert Dep. at 100:11–22). Castro received a warning and was required to undergo training. (*Id.* at 100:25–101:4).

Although there is no evidence in the record affirming the following contentions, General Plastics asserts that on March 17, 2017, North filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC"), and that the TWC declined to investigate and issued a right-to-sue letter on September 29, 2017. [Doc. No. 35 at 10]. North filed the instant suit in federal court on August 24, 2017, and the second suit involving his Title VII claims on December 1, 2017. (Doc. No. 1). Between the two original lawsuits, which were consolidated before the Court as previously noted, North brings the causes of action for violation of overtime provisions of the FLSA and discrimination and retaliation under Title VII and Chapter 21 of the Texas Labor Code.[1]

---

[1] At no point in his First Amended Complaint in the companion case, Cause No. 17-cv-3653, did North allege a hostile work environment or raise the claim in a cause of action.

### III. Standard of Law

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the Court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255.

In considering the evidence presented by the parties, the Fifth Circuit has made clear that "unsubstantiated assertions are not competent summary judgment evidence" and that "[s]ummary judgment . . . may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, . . . if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993).

Local Rules 7.3 and 7.4 of the Southern District of Texas state that a response to a motion will be submitted to the judge within twenty-one (21) days after filing and that the failure to respond will be taken "as a representation of no opposition." Rule 7.4(a) plainly states that such responses must be filed by the submission date, which in this case, passed long ago.

Therefore, the local rules would allow the Court to grant Defendants' motion as it should be considered unopposed. However, the Fifth Circuit has explained that "although we have endorsed the adoption of local rules that require parties to file responses to opposed motions, we have not approved the automatic grant, upon failure to comply with such rules, of motions that are dispositive of the litigation." *See Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006) (citing *Johnson v. Louisiana*, 757 F.2d 698, 707–09 (5th Cir. 1985); *Ramsey v. Signal Delivery Serv.*, 631 F.2d 1210, 1213–14 (5th Cir. 1980)). In other words, where a party does not respond to a summary judgment motion, such failure does not permit the court to enter a "default" summary judgment. *Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988). A court, however, is permitted to accept the movant's facts as undisputed when no response or opposition is filed. *Id.* Normally, "[a] summary judgment nonmovant who does not respond to the motion is relegated to [his] unsworn pleadings, which do not constitute summary judgment evidence." *Bookman v. Schubzda*, 945 F. Supp. 999, 1002 (N.D. Tex. 1996) (citing *Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir. 1991)). In this case, North has not filed a response to the motion and his pleadings are not verified,[2] and, therefore, North has presented no summary judgment evidence to dispute Defendants' version of the facts or their arguments supporting summary judgment. *Stone v. United States*, No. Civ. A. 1:09-CV-427, 2011 WL 3652758, *2 (E.D. Tex. July 22, 2011).

### IV.    Defendant's Motion for Summary Judgment

### A. Violations of Title VII

The standard for granting summary judgment in a Title VII case has been well established by the Supreme Court in the cases following *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

---

[2] On summary judgment, factual allegations set forth in a verified complaint may be treated the same as when they are contained in an affidavit. *Hart v. Hairston*, 343 F.3d 762, 765 (5th Cir. 2003) (citing *Huckabay v. Moore*, 142 F.3d 233, 240 n.6 (5th Cir.1998)). As stated above, none of the Complaints in this case are verified.

(1973).[3] "First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 802). This is not an "onerous burden." *Id.* at 253. To establish a prima facie case of discrimination with respect to compensation, the plaintiff must show she was paid less than an employee outside of her protected class for work requiring "substantially the same responsibility." *See Johnston v. TCB Const. Co., Inc.*, 334 F. App'x 666, 670 (5th Cir. 2009). With respect to discriminatory discharge, the plaintiff must show that he or she "(1) is a member of a protected class, (2) was subjected to an adverse employment action, (3) was qualified for her position, and (4) was replaced by someone outside of the protected class." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir.2007). If an employer fails to present evidence against this presumption, the court must enter summary judgment for the plaintiff. *Burdine*, 450 U.S. at 254.

"Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253 (quoting *McDonnell Douglas*, 411 U.S. at 804). This burden "is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). The defendant does not need to prove that its proffered reason was the actual motivation, but its

---

[3] The Court notes that North also brought his discrimination claim under Chapter 21 of the Texas Labor Code. The Supreme Court of Texas has explained that "[i]n enacting [Chapter 21], the [Texas] Legislature intended to correlate state law with federal law in employment discrimination cases." *M.D. Anderson Hosp. and Tumor Inst. v. Willrich*, 28 S.W.3d 22, 24 (Tex. 2000) (citing Tex. Lab. Code § 21.001). "Adhering to legislative intent, Texas courts have looked to federal law in interpreting [Chapter 21's] provisions." *Id.*; *see also Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999) ("The law governing claims under [Chapter 21] and Title VII is identical."). Accordingly, the Court looks to precedent interpreting Title VII when evaluating North's claims under Chapter 21 of the Texas Labor Code.

explanation "must be legally sufficient to justify judgment" for the employer. *Burdine*, 450 U.S. at 255.

If the defendant provides such a reason, the burden shifts again: "[T]he plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 253 (citing *McDonnell Douglas*, 411 U.S. at 804). A plaintiff can succeed in this "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256.

The Supreme Court has noted that the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. Restated, "[i]t is not enough . . . to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *St. Mary's Honor*, 509 U.S. at 519.

### i. Title VII Race Discrimination

As the basis for his Title VII discrimination claim, North alleges that discriminatory comments were made about him during his employment by two co-workers and that he was paid on an hourly basis rather than a salaried basis like similarly situated employees of other races.

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a prima facie case of national origin discrimination under Title VII, North must show that (1) he is a member of a protected group; (2) he was qualified for the position; (3) he was discharged or suffered another adverse employment action; and (4) he was replaced by someone outside his protected group or the adverse employment

action was due to the plaintiff's membership in the protected class. *Harrison v. Corr. Corp. of Am.*, 476 F. App'x 40, 43 (5th Cir. 2012).

The Defendant argues that North has not established a prima facie case of discrimination, and that even if the Court finds that North did so, that Defendant has set forth legitimate non-discriminatory reasons for the adverse employment action: termination. In particular, General Plastics argues:

> (1) North cannot point to a similarly situated comparator who was paid more or a salary; (2) the only competent evidence shows that several African American supervisors were paid more than North in exempt salaried positions that required more responsibilities . . . ; (3) North was paid hourly because his duties did not involve enough exempt level work to fall within the FLSA's narrowly construed exemptions; and (4) General Plastics had a legitimate, race-neutral reason to fire North: he falsified time weeks after he sent sexually inappropriate messages and pictures to a colleague.

(Doc. No. 35 at 11).

In his deposition, North pointed to two comparators, David Plunkett ("Plunkett") and Malcolm Fernandes ("Fernandes") who he believes were similarly situated but paid more. [North Dep. 234:22–235:3]. In its summary judgment evidence, General Plastics provided its employment records for Plunkett and Fernandes, who were both employed as production supervisors. (Doc. No. 35, Ex. A ¶ 7). Plunkett (a Caucasian male) was hired in 2014 and supervised approximately 26 employees. (*Id.* ¶ 7). Fernandes (a Hispanic and Indian male) took over Plunkett's position in 2015. (*Id.* ¶ 7). Their job as production supervisors involved overseeing the seven departments of employees that comprised the day-shift materials building. (*Id.* ¶ 7). North's role as a Filament Winding Supervisor was to oversee one of those seven groups. (*Id.* ¶ 7). North never held the role of production supervisor or productions manager at General Plastics, and thus was not a similarly situated employee to Plunkett or Fernandes, his comparators. (*See id.* ¶ 8).

General Plastics also provides sworn affidavits attesting to the method in which it determines rates of pay or salary for employees. They aver that General Plastics determines the salary or hourly rates for incoming employees based on the position, the nature of job responsibilities tied to the position, existing market conditions at time of hire, and the company's financial circumstances at time of hire. (*Id.* ¶ 9). All subsequent employment decisions after hire are based on performance, disciplinary history, and market conditions. (*Id.* ¶ 9).

The Court need not answer whether North successfully established a prima facie case because, even assuming *arguendo* that he can do so, his claim nonetheless fails because he cannot establish pretext for General Plastic's ultimate employment decision to terminate him for cause.

In the context of a discrimination claim, the Fifth Circuit, in accordance with the language of Title VII, "only recognizes ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating as actionable adverse employment actions." *Harrison*, 476 F. App'x at 43 (citing *McCoy v. City of Shreveport*, 492 F.3d 551, 559-60 (2007)). Although compensation and termination from employment qualify as actionable employment events, the analysis does not end there. As previously stated, the plaintiff's burden at this stage is not an "onerous burden," but the plaintiff "must prove by a preponderance of the evidence [or in the summary judgment context that there are issues of material fact to support the proposition] that []he applied for an available position for which []he was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253 (citing *McDonnell Douglas*, 411 U.S. at 802).

First, with regard to pay, North has not provided any evidence that his hourly rate and receipt of overtime payments were done with a discriminatory purpose or under pretext. The FLSA, as detailed below, requires employers to pay non-exempt employees a minimum hourly rate plus overtime to employees who work more than 40 hours in a week. 29 U.S.C. § 207(a)(2).

General Plastics, in an effort to comply with FLSA requirements, avers that it has never paid salary to any employee in one of the three positions held by North during his employment. (Williams Decl. ¶ 8). North has not provided any evidence demonstrating that he was paid in a disparate and discriminatory manner compared to equally situated employees. In fact, the summary judgment evidence shows that prior to the disciplinary issues, North was promoted and his hourly rate was increased three times in two years. (North Dep. at 223:13-20; Williams Decl. ¶ 9). Second, with regard to his termination, General Plastics has provided a legitimate, non-discriminatory reason for the employment decision, namely that North first sexually harassed a co-worker and then engaged in time theft against the company, as was described in detail above. There is no evidence to contradict this.

Indeed, even if General Plastics was wrong about whether North actually engaged in sexual harassment or time theft, the company's belief that he did engage in those activities is legally sufficient to provide a legitimate, nondiscriminatory reason for North's termination. "[W]here an employer wrongly believes that an employee has violated company policy, it does not discriminate in violation of Title VII if it acts on this belief." *Corley v. Jackson Policy Dep't*, 566 F.2d 994, 1003 n.14 (5th Cir. 1978). This is particularly the case where the company relied on an internal investigation to determine how to deal with the allegations against North. *See Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 148 (2000) (finding there is no pretext "if the record conclusively [shows]" a "nondiscriminatory reason for the employer's decision"). In this case, the uncontroverted summary judgment evidence includes witness interviews, signed witness statements, notes of video footage, and time audits with regard to the two given reasons for North's termination.

North also apparently argued in his EEOC charge that two coworkers made racially disparaging remarks, and that these remarks should show discrimination was at work. [*See* Doc.

No. 35 at 10]. The only summary judgment evidence in the record related to this is a brief reference in North's deposition of two men in his department using a racial slur, which he believed was directed at him. [North Dep. at 238:1–10]. North has provided no further summary judgment evidence to support this claim. Nevertheless, assuming that the racially discriminatory comments allegedly made by the coworker did occur, North has not demonstrated that an employee with authority over him made any similar or otherwise discriminatory remarks or otherwise endorsed them. Under Title VII, "stray remarks with no connection to an employment decision cannot create a fact issue regarding discriminatory intent and are insufficient to defeat summary judgment." *Scales v. Slater*, 181 F.3d 703, 312 (5th Cir. 1999); *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 337 (5th Cir. 1997). North provided no evidence (or even argument) that a supervisor or employer with the ability to make ultimate employment decisions made a similar remark. *See Rios v. Rossotti*, 252 F.3d 375, 382 (5th Cir. 2001) (explaining that unless the ultimate decisionmaker acts simply as a "rubber stamp" for a subordinate's recommendation with regard to the plaintiff, "statements by non decision makers, or statements by decision makers unrelated to the decisional process itself [do not] suffice to satisfy the Plaintiff's burden") (citing to *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)). North has not argued or presented evidence suggesting that the workers at issue had decision making authority over the terms of his employment.

Accordingly, even assuming that North could demonstrate a prima facie case of race discrimination, he has not raised an issue of material fact suggesting that his rate of pay on an hourly basis or his termination were pretextual.

*ii.  Title VII Retaliation*

Title VII also makes it unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e-3(a). For a Title VII retaliation claim, a plaintiff must show: "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Thomas v. Tex. Dep't of Crim. Justice*, 220 F.3d 389, 394 (5th Cir. 2002). For a retaliation claim, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotes omitted). If the plaintiff makes a prima facie case of discrimination, and if the employer articulates a legitimate, non-discriminatory reason for the adverse action, then the burden shifts back to the plaintiff to provide "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

North alleged in his deposition[4] that he made a verbal complaint to Edgar Castro and Charlie Chapman stating that he had overhead racially derogatory remarks about him. [North Dep. at 238:13–16]. North claims that he was fired because of that complaint, which was a protected activity. General Plastics disputes whether North can establish a prima facie case, much less raise an issue of material fact regarding the circumstances of his termination or a causal link between his alleged protected activity and the termination.

---

[4] General Plastics also contends that North alleged this in his EEOC charge; however, the EEOC charge was not attached to North's First or Amended Complaint in Cause No. 17-cv-3653, despite being referenced in his various versions of the Complaint.

In particular, General Plastics alleges no one at the company with authority to hire or fire North had knowledge of the protected activity. General Plastics argues that without knowledge of the protected activity, it could not have retaliated because of it. To establish a causal link between the protected activity and the adverse employment decision, the evidence must demonstrate or raise an issue of material fact suggesting that "the employer's decision to terminate was based in part on knowledge of the employee's protected activity." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001); *see also Chaney v. New Orleans Pub. Facility Mgmt., Inc.*, 179 F.3d 164, 168 (5th Cir. 1999) ("If an employer is unaware of an employee's protected conduct at the time of the adverse employment action, the employer plainly could not have retaliated against the employee based on that conduct."). According to the uncontroverted summary judgment evidence, the only person at General Plastics with authority to hire or fire was Walstad, the CEO. (Williams Decl. ¶ 2). Walstad had no knowledge of the alleged complaint to Chapman and Castro at the time of North's termination. Further, North points to no evidence in the record to demonstrate that Walstad knew about the complaint at any point during North's employment. Although "the employee should demonstrate that the employer knew about the employee's protected activity," North has offered no evidence supporting his claim. *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003).

Moreover, even assuming that North could meet this burden, his retaliation claim would still fail at summary judgment. If North could establish a prima facie case, General Plastics has satisfied its burden of articulating a legitimate, nondiscriminatory reason for terminating North. The burden therefore shifts back to North to provide "proof" that General Plastics' offered legitimate, nondiscriminatory reason for his termination "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *See Nassar*, 570 U.S. at 360. Because North alleges that General Plastic's proferred reason for his termination was mere pretext for

retaliatory actions, North bears the burden to introduce evidence supporting this claim. *Medina*, 238 F.3d at 684. This burden requires North to demonstrate "that he would not have been terminated 'but for' engaging in protected activity." *Id.* (citing *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1123 (5th Cir. 1998)). The Fifth Circuit has explained that the burden for demonstrating pretext is even more stringent than that for showing a causal link. *Id.* (citing *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116–17 (5th Cir. 1983)). "The plaintiff must reveal a conflict in substantial evidence on the ultimate issue of retaliation in order to withstand a motion for summary judgment." *Id.* (quoting *Sherrod*, 132 F.3d at 1122). Here, North has failed to do so.

### iii.  Title VII Hostile Work Environment

As the Court noted in Footnote 1, North did not plead a hostile work environment cause of action in his First Amended Complaint. He has not filed for leave to amend to add this cause of action. The Court finds that this issue has not been properly raised and therefore is not before the Court.

### B.  Violations of the FLSA's Overtime Provisions

Under the Fair Labor Standard Act ("FLSA"), employers must pay their employees overtime wages if employees work more than forty hours a week. *See* 29 U.S.C. § 207(a) (requiring employers to compensate covered employees "at a rate not less than one and one-half times the [employee's] regular rate for hours worked in excess of 40 hours per week). The overtime provisions do not apply, however, to employees exempted by Section 213. *See* 29 U.S.C. § 213 ("The provisions of section [] . . . 207 of this title shall not apply with respect to-- (1) any employee employed in a bona fide executive, administrative, or professional capacity . . . ."). General Plastics and North do not contend that he was exempt. North's claim is that he was not paid for overtime worked as required under the FLSA.

The Fifth Circuit has explained that a plaintiff bringing an FLSA claim for unpaid overtime must make several factual showings: First, a plaintiff must show that he or she was "employed" by the defendant during the periods of time for which he or she claims unpaid overtime, that is, that the defendant had actual or constructive knowledge that plaintiff worked during those hours. *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995). As part of that inquiry, the plaintiff must demonstrate that he or she did not fail to notify the employer of the overtime or prevent the employer from learning of the overtime work. *See id.* (quoting *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)) (stating that if "an employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for overtime hours is not a violation of § 207"). Further, the plaintiff must present evidence of what overtime pay is due: "[A]n employee who brings suit for unpaid overtime compensation bears the burden of proving, with definite and certain evidence, that he performed work for which he was not properly compensated." *Reeves v. Int'l Telephone & Telegraph, Co.*, 616 F.2d 1342, 1351 (5th Cir. 1980), *cert. denied*, 449 U.S. 1077 (1981).

That is not to say that a plaintiff cannot recover because he or she cannot prove the precise number of hours worked without overtime pay. "It is the employer's duty to keep records of the employee's wages, hours, and other conditions and practices of employment; the employer is in a superior position to know and product most probative facts concerning the nature and amount of work performed and '[e]mployees seldom keep such records themselves.'" *Ford v. Hou. Indep. Sch. Dist.*, 97 F. Supp. 3d 866, 872–73 (S.D. Tex. 2015) (Harmon, J.) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). "A plaintiff need not prove each hour of overtime with unerring accuracy or certainty." *Prince v. MND Hospitality, Inc.*, No. H-08-2617, 2009 WL 2170042, at *6 (S.D. Tex. July 20, 2009) (Rosenthal, J.) (internal quotations omitted). However, evidence must be provided. The nonmovant must identify specific evidence in the record and

articulate how that evidence supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). As the Court has previously outlined, the nonmovant's burden to raise an issue of material fact "will not be satisfied by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

North alleges that he was not paid for overtime worked but has provided no summary judgment evidence. As discussed above, General Plastics has provided ample uncontroverted summary judgment evidence establishing its thorough internal audit of North's time records, which resulted in retroactive active pay being awarded to North for 19.75 hours. In order to substantiate his claims that yet more overtime pay is due, North bears the burden to present evidence demonstrating that his employer's time records are inaccurate and that he worked additional overtime hours that have not been compensated. In his Complaint, North alleges that his phone GPS records demonstrate that he was at work for more time than was paid. Bare assertions without supporting evidence, however, are insufficient at summary judgment. North has provided no evidence (indeed, no further argument) to demonstrate any issues of material fact exist with regard to General Plastic's time records and pay stubs, which are in the record as uncontroverted summary judgment evidence. [See Doc. No. 35-8, Ex. F-1 ("North Time Records"); Doc. No. 35-8, Ex. F-2 ("North Pay Statements").

Without any controverting evidence from North to support or substantiate his claims, the Court cannot find an issue of material fact regarding General Plastic's compliance with the FLSA. General Plastics has presented uncontroverted evidence regarding how it keeps its time records, how it audits them, how it did so specifically regarding North, his pay and time records, and how it determined whether North should be paid as an hourly or salaried employee. Accordingly, the Court also grants summary judgment for General Plastics on North's FLSA claim.

## V.    Conclusion

For the reasons set forth above, Defendant General Plastic's Motion for Summary Judgment (Doc. No. 35) is **GRANTED**. General Plastics' Motion for Immediate Relief from Pretrial Filing Deadlines Pending Resolution of Summary Judgment Motion (Doc. No. 50) is **DENIED** as moot. Accordingly, this case is **DISMISSED** with prejudice. A separate order entering final judgment will follow.

It is **SO ORDERED**.

Signed at Houston, Texas, this 2nd day of August, 2019.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE